UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IMPERIAL TRADING CO., INC., ET AL.          CIVIL ACTION

VERSUS                                       NO: 06-4262

TRAVELERS PROPERTY CASUALTY CO. OF          SECTION: R
AMERICA

**<u>ORDER AND REASONS</u>**

Before the Court are the parties' cross motions for partial
summary judgment on the issues of "rental value" (R. Doc. 115; R.
Doc. 110) and extra expenses (R. Doc. 117, R. Doc. 106).  For the
following reasons, plaintiffs' motion for summary judgment on
rental value is GRANTED IN PART; defendant's motion on the same
issue is DENIED.  In addition, plaintiffs' motion for summary
judgment for certain extra expenses is DENIED; defendant's motion
on the same issue is GRANTED.


**I. Background**

The plaintiffs in this case are the owners and lessees of
commercial properties that were damaged during Hurricane Katrina.
At the time of the hurricane, the properties in question were
insured by defendant Travelers Property Casualty Company of
America.  Plaintiffs submitted a claim to Travelers shortly after

1

the hurricane, and Travelers advanced plaintiffs $1 million for the covered losses to one property on September 25, 2005. Plaintiffs claim that Travelers failed to participate in the adjustment process in good faith after that point, reimbursing plaintiffs' for portions of the covered loss in small increments over the following year. At issue in this Order are two cross-motions for partial summary judgment, primarily regarding specific expenses incurred in the aftermath of Katrina that were claimed by plaintiffs but denied by defendant.

## II. Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party

will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish the existence of a genuine issue for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**III. Discussion**

**A. Rental Value**

Both parties seek summary judgment on the claim by plaintiff Lucky Coin Machine Co. ("Lucky Coin") to recover costs for "rental value" from the Airline Drive location. Plaintiffs claim that the insurance policy covers the $484,000 in rents paid by Lucky Coin to the owner of the Airline Drive location during the time that the building was uninhabitable. Lucky Coin's lease with the owner of the Airline Drive location makes clear that the obligation to pay rent is not suspended by damage to or destruction of the building. Defendant denied the claim on the

grounds that the insurance policy applies only for the benefit of the lessor, who is not a named insured on the policy.

The extent of coverage in an insurance policy is a matter of contractual interpretation. Guiding principles for construing contracts in Louisiana are set forth by the Louisiana Civil Code. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007); *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003). "Interpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ANN. art. 2045 (2008). Such intent is to be derived from the language of the contract itself. If that language is "clear and explicit and lead[s] to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id*. art. 2046. Words "must be given their generally prevailing meaning," and terms of art are interpreted as such only when a technical matter is at stake. *Id*. art. 2047.

The relevant contract provisions are hardly a model of clarity. Lucky Coin seeks coverage for the rental payments based on the Business Income Form, which provides as follows:

> Coverage is provided as described below for one of the following options for which a Limit of Insurance is shown in the Declarations:
> (i)   Business Income including "Rental Value";
> (ii)  Business Income Other than "Rental Value";
> (iii) "Rental Value"
> If option (i) above is selected, the term Business Income will include "Rental Value". If option (iii) is selected, the term Business Income will mean "Rental Value" only. . . .

> We will pay for the actual loss of Business Income you
> sustain due to the necessary suspension of your
> "operations" during the "period of restoration." The
> suspension must be caused by direct physical loss of or
> damage to the property . . . at premises which are
> described in the Declarations and for which a Business
> Income Limit of Insurance is shown in the Declarations.
> The loss or damage must be caused by or result from a
> covered cause of loss.

(R. Doc. 110, Ex. 1 at TRAVPOL000168.) It is undisputed that

Lucky Coin chose option (iii). "Operations" is relevantly

defined as "[y]our business activities occurring at the described

premises . . . and [t]he tenantability of the described premises.

. . ." (*Id.* at TRAVPOL000176.) The term "rental value" is

defined under the contract as the:

> a. Total anticipated rental income from tenant
>    occupancy of the premises described in the
>    Declarations as furnished and equipped by you, and
> b. Amount of all charges which are the legal obligation
>    of the tenant(s) and which would otherwise be your
>    obligations; and
> c. Fair rental value of any portion of the described
>    premises which is occupied by you.

(*Id.* at TRAVPOL000176-77.) Defendant asserts that plaintiffs'

rental payments are expenses and are not the type of business

income covered by the policy.

The language of the Business Income Form, incorporating

relevant definitions, states that defendant will pay for losses

of the fair rental value of plaintiffs' occupied space that are

sustained due to suspension of tenantability. The suspension

must be the result of damage to the covered premises by a covered

cause, and the losses must have been incurred during the period

5

of restoration. Plaintiffs can recover for losses to the fair rental value of the space they occupy.

The crux of this dispute revolves around the meaning of "fair rental value" under subsection (c) of the definition of rental value. As might be expected from a document that uses the term "rental value" to define "rental value," the policy has proven difficult to decipher. This difficulty has been compounded by the fact that the parties' views of this clause have evolved since the initial filing of the motion. Defendant's final position is that subsection (c) refers to the value of the tenant's right to sublease the property, but only if plaintiffs "have a reasonable expectation of doing it at the time of the loss, or reasonable intention of doing it or evidence of a reasonable expectation they were going to sublease . . . ." Likewise, defendant's brief argues that "[w]hen sub-section (c) is read in [the proper] context, it is clear that this provision provides coverage only where, during the period of restoration, the insured expected to obtain rental income from space that it had occupied." (R. Doc. 110 at 14.)[1] Plaintiffs, on the other

---

[1] Defendant also argues that plaintiffs chose the "rental value only" coverage option and expressly declined to choose coverage that would have provided for such ordinary business operating expenses as rent payments. It implies that this should have some bearing on whether the policy in this case contains the coverage plaintiffs assert. But plaintiffs' policy either does or does not cover the rental income that could have been earned by renting out the space they occupied. In either case, it is entirely without consequence that plaintiffs declined another

hand, assert that subsection (c) refers to the tenant's interest in the building's being rented and that their rental payments are a proxy for this value. Stated differently, plaintiffs claim that (c) insures an unacted-upon opportunity to rent the premises. Both parties agree that subsection (c) does not require an existing lease. This is consistent with the language of the policy, which covers rental *value* and not merely rental income.

The Court finds that both parties have set forth a reasonable interpretation of the contractual language at issue. Plaintiffs' interpretation is consistent with the plain language of the policy, which contains no express requirement that the insured have the expectation or intention to earn income from the premises it occupies. The first element of the rental value provision applies to "[t]otal anticipated rental income from tenant occupancy . . . ." Because the definition must be read as a whole, it is reasonable to interpret "fair rental value" in subsection (c) as meaning something other than the anticipated rental income from tenant occupancy. If it did not, then there would arguably be no difference between subsections (a) and (c),

_____

policy that contained such coverage. Plaintiffs of course could have chosen innumerable other forms of coverage, but none of the coverage in those other policies negates aspects of the policy that plaintiffs did choose. Defendants have supplied no reason why the Court's interpretation should take account of different insurance policies.

and such a conclusion would be untenable.  Plaintiffs assert that
(a) covers existing leases and premises held out for lease, and
(c) covers the opportunity to rent the premises that the insured
occupies.  This interpretation is reasonable under the policy
language.

Defendant, however, provides a similarly reasonable
interpretation of the policy.  It correctly states that, under
Louisiana law, "[e]ach provision in a contract must be
interpreted in light of the other provisions so that each is
given the meaning suggested by the contract as a whole."  LA.
CIV. CODE ANN. art. 2045 (2008).  It further asserts that the
policy as a whole covers business *income*.  The coverage evinces a
clear concern about loss of income and not merely expenses, and
the language of the policy makes clear that an "actual loss" is
required before defendant's indemnification obligation is
triggered.  (R. Doc. 110, Ex. 1 at TRAVPOL000168.)  Seen in this
broader context, defendant posits that section (a) provides
coverage for rental income under existing leases and section (c)
covers premises that the insured intends or expects to lease.
Defendant argues that the policy's actual-loss requirement
precludes plaintiffs from recovering hypothetical losses of
income streams they never expected or intended to receive.  If
plaintiffs never intended to sublease, then any "fair rental
value" they might have lost would be entirely hypothetical and

therefore nonrecoverable under the policy.  The Court finds that
defendant's proffered interpretation is likewise reasonable.

Because the policy's coverage for "rental value" is subject
to at least two reasonable interpretations, the Court finds that
it is ambiguous as a matter of law.  When a provision in an
insurance policy is found to be ambiguous, it "is construed
against the insurer and in favor of coverage." *Arctic Slope
Regional Corp. v. Affiliated FM Ins. Co.*, 564 F.3d 707, 709-10
(5th Cir. 2009) (quoting *Sher v. Lafayette Ins. Co.*, 988 So. 2d
186, 193 (La. 2008)); *see also Herbert v. Webre*, 982 So. 2d 770,
774 (La. 2008).  Accordingly, plaintiffs' interpretation
prevails.  "Fair rental value" under subsection (c) thus takes
the definition put forth by plaintiffs: the *potential* rent that
plaintiffs could have earned for the space they occupied,
regardless of whether they had any intention or expectation of
receiving such rent.  As long as they can show a loss of rental
value that was caused by direct physical damage to the Airline
Drive location, plaintiffs are entitled to the coverage in their
policy.

The parties have not marshaled any cases that are directly
on point to cast doubt on this holding, and the Court is not
aware of any.  Much of the available case law concerns insurance
policies that expressly require an existing renter or an
intention to rent some portion of the premises.  *See, e.g., Alden*

*v. USAA Cas. Ins. Co.*, No. 06-11420, 2009 WL 928901, at *2 (E.D. La. Apr. 3, 2009) (addressing coverage for "the fair rental value of that part of the Described Location rented to others or held for rental by you"); *Weintraub v. State Farm Fire & Cas. Co.*, 996 So. 2d 1195, 1197 (La. Ct. App. 2008) (materially similar coverage). The cases most similar to the present case underscore the reasonableness of each party's contention.

For example, in *Finer Amusements, Inc. v. Citizens Ins. Co. of N.J.*, 327 F.2d 773 (7th Cir. 1964), the insured tenant held materially similar coverage to that in the Travelers policy and evinced no intent to lease the premises. The court still concluded that the "tenant had an insurable interest under the policies." *Id.* at 775. It held, however, that the insured suffered no actual loss because its obligation to pay rent, unlike here, was abated by the casualty. The court noted that "[i]f plaintiff had been the owner occupying its own premises, it would have suffered a loss of rental value . . . by losing the rental potentiality of the premises." *Id.* Had the insured's obligation to pay rent not been abated, it would have been in the same position as the owner, and would have similarly suffered a loss of rental value. This holding gives credence to plaintiffs' position.

Conversely, in *Scott Mgmt., Inc. v. Commerce and Indus. Ins. Co.*, 956 F.2d 1163, 1992 WL 38155, at *2 (4th Cir. 1992) (per

curiam) (Table, Text in Westlaw), the court held that, under nearly identical policy language, an insured could not recover for loss of rental value unless it could "show that it was prevented from receiving rent it otherwise would have received." This in turn suggests support for defendant's arguments.

The remaining cases that defendant provides are all distinguishable, as they do not support the argument that "fair rental value" necessarily takes the construction they give it, or that plaintiffs have suffered no loss of rental value. *Macarty v. Commercial Ins. Co.*, 17 La. 365 (La. 1841), merely holds that a litigant must have suffered an actual insured loss before the insurer is required to pay under the policy. It does not explain why plaintiffs have not lost the opportunity to rent the premises they occupy, as is covered by the policy. Defendants also point to *Fed. Deposit Ins. Co. v. Fidelity & Deposit Co. Of Md.*, 1992 US Dist. LEXIS 21845, at *5 (M.D. La. 1992), which stated that "with an indemnity policy the insured must suffer an actual money loss before the insurer is obliged to pay . . . ." This proposition, however, derives from a Louisiana case that contains no such requirement of actual money loss. That case, *Quinlan v. Liberty Bank and Trust Co.*, 575 So. 2d 336, 348-49 (La. 1990), recites the familiar holding that an actual insured loss must precede payment by an insurer. *Fidelity* is likewise not instructive as to whether plaintiffs suffered an actual loss

11

under the policy at issue.[2]

Under the policy interpretation adopted by the Court, plaintiffs may recover for loss of fair rental value insofar as they lost the opportunity to earn rent from the premises they occupied. Plaintiff must, however, prove the amount of the fair rental value of the premises they occupied at the time of Katrina. "[F]air rental value," as used in an insurance policy, "corresponds to 'fair market value,' the 'highest price which a hypothetical buyer would pay to a hypothetical willing seller in an assumed free and open market.'" *Vt. Mut. Ins. Co. v. Petit*, 613 F. Supp. 2d 154, 159 (D. Mass. 2009). *Cf. In re Allied Printing, Inc.*, 344 B.R. 153, 156 n.1 (Bankr. M.D. Fla. 2005) ("The Lease provides that Fair Market Value and Fair Rental Value mean 'an amount which would obtain between an informed and willing [lessee] and an informed and willing [lessor]'"); *In re Jay*, 308 B.R. 251, 288 n.11 (Bankr. N.D. Tex. 2003) ("Fair rental value means what a reasonable and willing tenant would pay for the property."); *Razavi v. Comm'r of Internal Revenue*, 74 F.3d

---

[2] Defendant also presents two out-of-state cases that are distinguishable from the present case. *Sherbansky v. N.H. Ins. Co.*, 875 N.Y.S.2d 835 (N.Y. App. Div. 2008), holds that the plaintiff could not recover for the fair rental value of apartments he had no intention to sublease. Because there is no recitation of the contractual language in the case, this Court cannot determine that the case supports a similar result under defendant's policy. Furthermore, the policy language in *Chronicle Bldg. Co. v. N.H. Fire Ins. Co. Of Manchester, N.H.*, 94 S.E. 1043 (Ga. App. 1913), extends coverage to actual "loss of rents" and not "rental value."

125, 127 (6th Cir. 1996) ("fair rental value," in tax context, "reflects the amount at which property would change hands between a willing lessee and a willing lessor, neither being under any compulsion to enter into the transaction and both having reasonable knowledge of the relevant facts"); *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 706 (E.D. Va. 1987) (in takings context, "fair rental value [means] the rental price in cash, or its equivalent, that the leasehold would have brought at the time of taking, if then offered for rent in the open market, in competition with other similar properties at or near the location of the property taken, with a reasonable time allowed to find a tenant). Fair rental value is calculated on the date of the casualty, not during the highly unusual market conditions following Hurricane Katrina. *Petit*, 613 F. Supp. 2d at 159 ("The rental contracts in effect at the time of the fire provide the best evidence of the highest price a hypothetical renter would have been willing to pay the Petits to rent a unit at the Property."). Rental value coverage is a species of business income, and numerous courts in this Circuit have held that the proper reference point for calculating loss of business income is the time before the covered event and not the period following it. *See Finger Furniture Co., Inc. v. Commonwealth Ins. Co.*, 404 F.3d 312, 314 (5th Cir. 2005) ("The strongest and most reliable evidence of what a business would have done had the catastrophe

13

not occurred is what it had been doing in the period just before the interruption."); *Caitlin Syndicate, Ltd. v. Imperial Palace of Miss., Inc.*, No. 1:08CV97-HSO-JMR, 2008 WL 5235888, at *6-7 (S.D. Miss. Dec. 15, 2008) (holding that coverage should be based on pre-Katrina profits because "[h]ad Hurricane Katrina not occurred, [the insured's] competitors would have remained open."); *see also Levitz Furniture Corp. v. Houston Cas. Co.*, No. 96-1790, 1997 WL 218256, at *3 (E.D. La. Apr. 28, 1997). *But see SR Int'l Bus. Ins. Co., LTD v. World Trade Ctr. Props. LLC.*, No. 01 Civ. 9291HB, 2007 WL 519245, at *2 (S.D.N.Y. Feb. 16, 2007). Such an approach is also more consistent with the notion "that insurance should be a device for making a person whole after a loss is suffered rather than a way in which he might increase his wealth at the expense of a common fund." William Shelby McKenzie and H. Alston Johnson, III, LOUISIANA CIVIL LAW TREATISE: INSURANCE LAW AND PRACTICE § 312 (3d ed. 2009); *see also Ferguson v. State Farm Ins. Co.*, No. 06-3936, 2007 WL 1378507, at *3 (E.D. La. 2007).

Plaintiffs have not supplied a calculation of fair rental value. Instead, all along they have pointed to the rent they paid to the owner of the Airline Drive location while the building was untenantable. A single transaction made in 2000, even if it was arm's-length, does not without more demonstrate the fair rental value of the property in September of 2005. Nothing in the record indicates that the rental payments are

14

characteristic of those that would have been paid at the time of Katrina, or that the amounts stated in the Airline Drive lease are not atypical.  In order to recover losses to fair rental value, plaintiffs still must prove that these rental payments are in fact a proxy the fair market value of the premises at the time of Hurricane Katrina.  While the rent plaintiffs paid at the time of the loss is enough evidence of the fair market value of a lease on the premises to create a triable issue, they have failed to make an adequate showing that summary judgment should issue in their favor.  The issue of whether the $484,000 in rental payments represents the fair rental of the premises at the time of Katrina may proceed to trial.  Plaintiffs' motion for partial summary judgment on this issue is therefore GRANTED IN PART. Defendant's motion is DENIED.

## C. Payroll Costs, Employee-Retention Bonuses, and On-Site Living Expenses for Employees

The parties have also filed cross-motions for partial summary judgment with regard to certain extra expenses that plaintiffs incurred after Hurricane Katrina.  These expenses fall into three categories: (1) plaintiffs' claims for payroll expenses, (2) plaintiffs' payment of retention and incentive bonuses, and (3) plaintiffs' claim for on-site housing for its

employees.[3]  Again, this court must interpret the insurance

contract in accordance with Louisiana law, adhering to the

generally prevailing meaning of words and relying on clear and

explicit language.

The policy states that Travelers "will pay the actual

reasonable and necessary Extra Expense you sustain due to direct

physical loss of or damage to property . . . .  The loss or

damage must be caused by or result from a Covered Cause of loss."

(R. Doc. 115, Ex. A at TRAVPOL000178.)  The definition of "Extra

Expense" is detailed in the policy:

> Extra Expense means reasonable and necessary expenses
> you incur during the "period of restoration" that you
> would not have incurred if there had been no direct
> physical loss or damage to property:
>
> a. To avoid or minimize the suspension of business and
>    to continue "operations";
>    (1) At the described premises; or
>    (2) At replacement premises or at temporary
>        locations, including:
>        (a) Relocation expenses;
>        (b) Costs to equip and operate the
>            replacement or temporary locations; and
>        (c) Expediting expenses;
> b. To minimize the suspension of business if you cannot

---

[3]  Plaintiffs' motion makes mention of a variety of other
expenses, but it elsewhere notes that it seeks a summary judgment
ruling on these three categories only.  (R. Doc. 117 at 15 n.66.)
Plaintiffs seek a further ruling that "the thirty-day period of
restoration applied by Travelers was wrong."  Both parties agree,
however, that the length of the restoration period is a question
for the jury.  (R. Doc. 117 at 15-16; R. Doc. 138 at 4 n.7.)
Although plaintiffs have marshaled arguments in favor of their
position, they have also conceded that a genuine issue of
material fact exists with respect to this issue.  Summary
judgment is therefore inappropriate at this time.

continue "operations"; or
        c.    (1) To repair or replace or restore any property;
                  or
              (2) To research, replace or restore the lost
                  information on damaged valuable papers and
                  records (other than accounts receivable);
                  to the extent it reduces the amount of loss
                  that otherwise would have been payable under
                  this Coverage Form.

(R. Doc. 115, Ex. A at TRAVPOL000178.)  "Operations" refers to

plaintiffs' "business activities occurring at the described

premises."  (R. Doc. 115, Ex. A at TRAVPOL000181.)

    Plaintiffs seek payment for payroll costs because employees

were paid to clean up some of the debris and damage wrought by

Hurricane Katrina upon the facility located on Edwards Avenue in

Harrahan, Louisiana.  The evidence, however, does not support a

determination that the payroll costs were "extra expenses," i.e.,

those that plaintiffs "would not have incurred if there had been

no direct physical loss or damage to property."  While no one

disputes that plaintiffs paid employees to clean up debris in the

aftermath of Katrina, plaintiffs have proffered no evidence to

show that they incurred extra payroll costs in doing so.

Specifically, there is no evidence that plaintiffs paid employees

more than they would have paid them in the absence of physical

damage to the Edwards Avenue building.  In fact, plaintiffs' Rule

30(b)(6) designee, W. Gilbert Stroud, stated in his deposition

that the employees were "filling customer orders and driving the

orders to the customers.  And then if they had extra time, they

were cleaning up." (R. Doc. 106, Ex. 3 at 375-76.) According to Mr. Stroud, the extra time was attributable to a downturn in business after Hurricane Katrina, and if the employees were not put to work assisting with damage, plaintiffs "would just send them home." (*Id.* at 359.) Plaintiffs paid these employees their usual salaries. (*Id.* at 360.) There is no evidence that plaintiffs' payroll costs were any more than they would have been if there had been no damage to the building. Indeed, Mr. Stroud testified that plaintiffs' overall payroll costs decreased after Katrina because some employees did not return. (*Id.* at 361.)

The cases discussed by both parties underscore this determination. In each case, the determination to extend or not to extend coverage to payroll costs hinged on whether those costs would have been incurred had there been no damage or had the "extra expenses" provisions of the insurance policies not been implicated. *See Consolidated Cos., Inc. v. Lexington Ins. Co.*, No. 06-4700, 2009 WL 211751, at *11 (E.D. La. Jan. 23, 2009) (finding Extra Expense coverage because plaintiff "had to double its usual staff of employees to address inefficient conditions at the warehouse, such as debris removal, refrigeration problems, and the destruction of the inventory tracking system"); *Fold-Pak Corp. v. Liberty Mut. Fire Ins. Co.*, 784 F. Supp. 49, 55-56 (W.D.N.Y. 1992) (finding that "salaries . . . are expenses that plaintiff would have incurred even if there had been no fire" and

18

that "plaintiff simply did not incur these expenses for the purpose of reducing its loss of income"); *Travelers Indem. Co. v. Pollard Friendly Ford Co.*, 512 S.W.2d 375, 380 (Tex. Civ. App. 1974) (finding that coverage extended to "additional hours worked" and "extra compensation").[4]  Here, plaintiffs have offered nothing to demonstrate that their payroll costs are "extra" or that there is an issue of fact for the jury.

With respect to the employee-retention bonuses, there is similarly no genuine issue of material fact.  Plaintiffs claim that they were forced to make incentive payments to their employees at the Edwards location to keep them from leaving the New Orleans area.  But there is no apparent connection between the incentive payments and the physical damage to the insured property.  Mr. Stroud testified directly to this point, stating that the bonuses were given to keep people from leaving for other states to be with their families or because there was "nothing to do" in the New Orleans area.  (R. Doc. 106, Ex. 3 at 365.)  He explicitly stated that plaintiffs made the bonus payments because of the general hurricane devastation, not because of damage to the building.  Furthermore, he noted that if the building had sustained similar damage in the absence of the wider devastation caused by Hurricane Katrina, no incentive payments would have

---

[4]  The parties also discuss *Sears Holdings Corp. v. Ace Am. Corp.*, a post-Katrina arbitral decision.  This decision has no precedential value, and the Court does not rely upon it.

been necessary. (*Id.* at 366-67.)  No tie is ever asserted between the incentives and damage to the building.[5]

Lastly, plaintiffs seek compensation for a "makeshift housing shelter for its employees" at the Edwards Avenue location, which resulted in "numerous expenses for bedding, food, and other items and services." (R. Doc. 117 at 4.)  Again, Mr. Stroud presented unrebutted testimony to the effect that these expenses were undertaken because of the damage done by Hurricane Katrina to the employees' *homes*, not to the building at Edwards Avenue.  When asked, "would it be true that [if the building sustained the same damage in the absence of a hurricane] it also would not have been necessary to house employees?" Mr. Stroud responded, "That's right." (R. Doc. 106, Ex. 3 at 367.)  Even more explicitly, when asked whether "it wouldn't have been necessary to [house employees] if the only property that was damaged was the Edwards Avenue property," Mr. Stroud replied, "That's correct." (*Id.* at 368.)

The policy unambiguously declares that Extra Expenses must be reasonable and necessary, and will be paid only if, among other requirements, they are "sustain[ed] due to direct physical

_____

[5]  Plaintiffs have also pointed to certain deposition testimony to support their position.  This testimony, given by defendant's claims-handling expert, makes reference to the fact that he has, in the past, paid for expenses resulting from general devastation of an area.  (R. Doc. 139, Ex. D.)  It does nothing to establish the principle that these particular expenses are covered by the particular policy in dispute.

loss of or damage to property . . . at the premises which are
described in the Declaration." Consistent with this language,
expenses sustained due to damage to *other* premises, or no
premises at all, will not fall under the contractual definition
of "Extra Expenses." Plaintiffs have pointed to nothing to
dispute this other than a handful of cases that do not support
their position. In *Rimkus Consulting Group, Inc. v. Hartford
Cas. Ins. Co.*, 552 F. Supp. 2d 637 (S.D. Tex. 2007), the court
found that housing expenses were covered when a consulting firm
was forced to relocate after Hurricane Katrina. The Extra
Expense coverage, however, was justified because the new offices
were "at least two hours from New Orleans" and that the temporary
housing was established to minimize business interruptions. *Id.*
at 646. The court noted that "[i]t is clear that Rimkus incurred
these expenses in order to resume business operations, not
because of the damage to the employees' homes." *Id.* In the
present case, Mr. Stroud clearly stated that the temporary
housing was established because of damage to the employees' homes
and that the on-site housing expenses would not have been needed
otherwise.

Plaintiffs have submitted a reply brief on this issue
containing new evidence that is at odds with Mr. Stroud's
testimony. Specifically, they have provided the court with a
deposition from an employee – Wayne Baquet, Jr., the president of

Imperial Trading Co. – who contradicts the earlier testimony of
Mr. Stroud, plaintiffs' Rule 30(b)(6) designee.  This Court will
not consider this evidence.  Rule 30(b)(6) of the Federal Rules
of Civil Procedure allows for the deposition of a corporation or
other entity through a designated representative.  "[A] rule
30(b)(6) designee does not give his personal opinions, but
presents the corporation's 'position' on the topic.  When a
corporation produces an employee in response to a rule 30(b)(6)
notice, it represents that the employee has the authority to
speak on behalf of the corporation with respect to the areas
within the notice of the deposition.  This extends not only to
facts, but also to subjective beliefs and opinions." *Brazos
River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006)
(internal citations omitted); *see also Resolution Trust Corp. v.
S. Union*, 985 F.2d 196, 197 (5th Cir. 1993) ("When a corporation
or association designates a person to testify on its behalf, the
corporation appears vicariously through that agent.").

Numerous district courts have held that a party cannot
adduce additional evidence to rebut the testimony of its Rule
30(b)(6) witness when, as here, the opposing party has relied on
the Rule 30(b)(6) testimony, and there is no explanation for the
difference.  *See Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993
(E.D. La. 2000), *aff'd* 31 Fed. Appx. 151 (5th Cir. 2001) (per
curiam) (unpublished).  *See also State Farm Mut. Auto Ins. Co. v.*

*New Horizont, Inc.*, 250 F.R.D. 203, 212-13 (E.D. Pa. 2008)
(holding that a 30(b)(6) deposition is not an "irrebuttable
judicial admission, but the party still may not "retract prior
testimony with impunity" and courts can disregard inconsistent
testimony when the movant has relied on prior testimony); *Tex.*
*Technical Inst. v. Silicon Valley, Inc.*, No. H-04-3349, 2006 WL
237027, at *5 (S.D. Tex. Jan. 31, 2006) (magistrate opinion)
(declining to find that an affidavit created an issue of material
fact because it conflicted without explanation with testimony of
a Rule 30(b)(6) representative); *Rainey v. Am. Forest and Paper*
*Ass'n, Inc.*, 26 F. Supp. 2d 82, 94-95 (D.D.C. 1998) (holding that
"[u]nless it can prove that the information was not known or was
inaccessible, a corporation cannot later proffer new or different
allegations that could have been made at the time of the 30(b)(6)
deposition" and that an "eleventh hour alteration is inconsistent
with Rule 30(b)(6), and is precluded by it"); *Ierardi v.*
*Lorrillard, Inc.*, No. 90-7049, 1991 WL 158991, at 3 (E.D. Pa.
Aug. 13, 1991).[6]  In addition, it is abundantly clear that courts

_____

[6]  A number of cases make clear that 30(b)(6) is distinct
from a judicial admission that cannot be retracted or
contradicted.  *See, e.g., A.I. Credit Corp. v. Legion Ins. Co.*,
265 F.3d 630, 637 (7th Cir. 2001) (noting that 30(b)(6) testimony
may be "contradicted or used for impeachment purposes" like any
deposition testimony) (quoting *Indust. Hard Chrome, Ltd. v.*
*Hetran, Inc.*, 92 F. Supp. 2d 786, 791 (N.D. Ill. 2000); *R&B*
*Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 786-87
(8th Cir. 2001); *see also* 8A Charles Alan Wright, et al., Federal
Practice and Procedure § 2103 (2d Ed. 1994 & 2009 Supp.).  This Order
should not be interpreted as saying otherwise.

in this Circuit will not, without explanation, allow a party to create an issue of material fact and survive summary judgment merely by submitting evidence that contradicts its earlier deposition testimony. *See Wells v. Union Pac. R.R. Co.*, No. 9:07cv27, 2008 WL 4179265, at *6 (E.D. Tex. Sept. 4, 2008) ("When the non-movant in a motion for summary judgment submits an affidavit that directly contradicts and earlier deposition and the movant has relied upon and based its motion on the prior deposition, courts may disregard the latter affidavit."); *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 482 (5th Cir. 2002); *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

Mr. Baquet is the president of Imperial Trading. Plaintiffs knew where he was when they made their Rule 30(b)(6) designation. They knew where he was when they filed their motion for partial summary judgment on extra expenses, as well as when they responded to defendant's motion for summary judgment on the same issue. In fact, Mr. Baquet was present at Mr. Stroud's deposition, which was taken on May 14, 2009. Plaintiffs have provided no reason or explanation why they failed to provide this testimony in their earlier filings, nor have they explained why Mr. Baquet testified differently from Mr. Stroud. *See Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894-95 (5th Cir. 1980)

(noting legitimate reasons why witness's later affidavit may have conflicted with prior deposition testimony). Accordingly, this Court rejects the proffered testimony of Mr. Baquet.

In the absence of this evidence, plaintiffs have failed to point to specific facts demonstrating a genuine issue of material fact for trial on these categories of extra expenses. Their motion for summary judgment is thus DENIED. Defendants' motion for summary judgment as to these three categories of expenses is GRANTED.

## IV. Conclusion

Plaintiffs' motion for partial summary judgment on the issue of "rental value" is GRANTED IN PART; defendant's motion is DENIED. With respect to extra expenses claimed by plaintiff, plaintiffs' motion for partial summary judgment is DENIED; defendant's motion is GRANTED.

New Orleans, Louisiana, this _____24th_____ day of July, 2009.

**SARAH S. VANCE**
**UNITED STATES DISTRICT JUDGE**